Good morning, Your Honors. May I please the Court, Jimmy Taus, on behalf of Appellant J.J. Little. I plan to reserve five minutes of my time for rebuttal, as well as any questions the Court may have. Your Honors, this case stems from the lower court's decision to apply an equitable doctrine that results in anything but an equitable result. The Court applied the doctrine of equitable mootness to determine that the case should be dismissed. They relied upon a very strict, stringent standard of indicating that because no stay was filed, the matter has now become moot. This Court and other courts have already ruled that it is not an absolute, strict requirement that a stay be filed. That's correct, but our cases also say it's a significant point. It is, Your Honor, and the point of that is because it is an equitable doctrine, the Court is trying to say, if you don't file the stay, unequitable things could occur, which leads to the other test as far as can matters be, can you unring the bell, frankly, of applying the plan that was approved in this case. And in this particular case, that bell can be unrung. This is not a very complicated matter. Most of the parties that were paid out already through the bankruptcy plan were actual insiders of Amber, particularly Mr. Post and the company he created, Post Management, which in the end ended up being the same principals managing the same company. It should also be noted that this stems from an underlying judgment in a fraudulent conveyance action. This case, then, after the fraudulent conveyance, two days after that judgment was entered, is when the other loan from the insiders was issued by Post. So let me ask you this. What is the relief that you would be able to obtain in the bankruptcy court? You say this is not a very sophisticated, complicated reorganization plan, correct? Correct, Your Honor. And there are not many parties to this plan. Correct, Your Honor. Correct. So what is it? How could the plan be rewritten to address the issues that Mr. Little raises? Your Honor, to begin with, the plan could address paying out of the parties more equitably and could revisit that. Mr. Little, who is the primary creditor in this matter, received $0.12 on the dollar, whereas every other creditor, at least every other creditor who was noticed, because there are a number of creditors who never received notice in the first place, but every other creditor to this matter, the ones that voted on the plan, received 100%. Would you have to claw back money that's already been paid out to do that? Only from the insiders. There are a couple third parties that if this court could fashion any number of remedies. We're not going to fashion any remedies. It would be the bankruptcy court. The bankruptcy court. If it was remanded, it could fashion any number of remedies, including creating a specific exclusion, although we don't believe that would be necessary, but creating a specific exclusion from clawing back for certain third parties who are truly third parties. The problem is that most of the parties here are not actually third parties, and, in fact, there are other parties who were never given notice of the bankruptcy proceeding in the first place. Let me ask you, I thought it was kind of interesting that a $1.2 million judgment got reduced to what? Through the valuation process? $140,000 roughly, Your Honor, if recollection serves. But it was basically $0.12 on the dollar. $0.12 on the dollar. Yes, Your Honor. And part of that whole issue, Your Honors, and it was somewhat disconcerting, obviously, to Mr. Little, is that the bankruptcy court had approved an independent examiner. The only requirement there was that Mr. Little be willing to pay for the examiner itself so that it didn't eat up trust funds. And such was done. However, the bankruptcy court decided to confirm the plan before the report from the independent examiner was completed and provided to the court to determine that. And, in fact, that plan found numerous discrepancies. In fact, it found three different sets of books that were being kept. So those matters in and of itself would have a direct effect on the entity's ability to propose a plan and how it was structured. That particularly is how it would pay its insiders. And in its own Schedule D, these insiders listed only half of their claim as secured and half as unsecured, yet the plan itself listed all of Mr. Post's claims as secured and paid out Mr. Post in excess of $240,000, I believe the number is, whereas Mr. Little has received nothing so far from this plan. Well, as I understand it, there's a chance he probably would – if this plan is fully implemented, it's doubtful that he'd really get anything. Your Honor, my understanding is that Amber is an ongoing concern. They have reorganized. They believe that they could. Whether or not Mr. Little is able to obtain 100% recovery or not is not really relevant to whether or not the money that Mr. Post, as an insider obtained, as an unsecured creditor, shouldn't be clawed back and be distributed more evenly amongst all the creditors. Well, Little has, on his claim, aren't there other lawyers that have got a lien on his claim, too? Yes, Your Honor. Yeah, so what kind of business is that? Well, Your Honor. A lawyer gets an award for the work he did on the case he got paid for, right? No, Your Honor. He got paid for it. He got paid only a very small portion of it. Why there's those liens from those subordinates? Well, I'm talking about this million dollars now with the interest and all that. That arose out of a lawsuit that he filed against the other people, the Amber people. That was after he got paid his attorney's fees on the litigation earlier, right? Your Honor, there was the initial litigation that resulted in the fee judgment. That award was then assigned to Mr. Little. He was paid for that. He was not, Your Honor. He was assigned the judgment in that original state court matter. He was not actually paid. I'm sorry, Your Honor. As part of his fee. Correct. Then he had to collect the judgment. Exactly, Your Honor. But Mr. Post, right after that, he had his own deal with Amber. Correct, which led to the second litigation of the fraudulent conveyance. Also, in addressing Your Honor's question as far as the other attorneys and their liens, those attorneys as well took the case on that original underlying action on a contingency basis, agreeing to accept a percentage of Mr. Little's fees. That's why those numbers are broken up the way they are, and that's how they received their fees. So they actually haven't been paid either. The reason that they are creditors in this action is the same reason that the Franchise Tax Board was listed as a creditor and was allowed, in fact, to vote on the confirmation plan. They stood in the same position by having placed a lien against Mr. Little's proceeds. However, unlike the Franchise Tax Board, those other creditors who are in the exact same position, their basis for being a creditor is because they placed a lien against Mr. Little's recovery, as did the Franchise Tax Board. Yet those other creditors were never given notice, weren't provided a chance to vote on the plan, object to the plan, file a claim under the bankruptcy reorganization in the first place, which in and of itself is a rather inequitable resolution to a matter that is now, again, being tried to resolve through inequality. Can I ask you a question? So Little obtained a judgment, correct, and he recorded it. Yes, Your Honor, in the second action you referred to, correct? Against personal property. Yes, Your Honor. Does that give him any greater status among the ranks of creditors? Yes, Your Honor, because once he registered that judgment, that actually creates a security interest against the personal property and real property, for that matter, of Amber and the debtor. So two days later, when Mr. Post decides to issue that loan, again, to the insider, to its own company, those funds that were distributed were, in fact, funds that Mr. Little already had a secured claim on. Those should never have been transferred in the first place. This was, frankly, more of the same as what the second judgment itself was for a fraudulent conveyance. So you have a situation where there's an initial action, a fraudulent conveyance, Mr. Little pursues that. There's the second action, he obtains a judgment based upon that fraudulent conveyance, then proceeds to the bankruptcy court where, again, they transfer money to insiders. There's no new money issued. There's no auction. Why wasn't there an avoidance action to avoid all those transfers? Well, Your Honor, this was pursued. It was believed. I cannot speak for the attorneys in the underlying action. I don't want to speculate. My understanding, upon reading the case file that they provided, does indicate that they believed that through the confirmation of the plan, that could be done and that would be clawed back anyhow, and they didn't need to actually go through the process of wasting everybody's resources on an adversary proceeding. So under the bankruptcy court's authority, when it approves a reorganization plan, it can move the judgment, the recorded judgment, into a lower class of creditors. That's what happened here, right? That is what happened here, Your Honor. Whether or not that was appropriate or not, I don't believe it was, but I do believe it is within the bankruptcy court's authority to have done so. But the issue of moving the admittedly unsecured claim of Mr. Post into a secured claim and then paying that off in full while moving Mr. Little's secured claim and turning that into an unsecured claim was part of the basis of the appeal. Right. Okay. You want to save the rest of your time for me? I will, Your Honor. Thank you very much. Thank you. Good afternoon. Actually, good morning, Your Honor. David Oberg. I represent Amber Hotel Corporation, the appellee in this matter. And as this court is aware, the district court properly dismissed as equitably moot the appeal regarding Amber's Chapter 11 plan of reorganization. Are you speaking? Louder. Sorry. Project. In this case, the district court properly applied the four-part test from THORP and found that equitable mootness should be applied and dismissed the appeal. And the primary reason was the fact that no stay was sought. Almost three years after the plan was confirmed, Amber moved forward, did everything that it was supposed to do to implement the plan. Third parties that are not before this court, and I'd like to correct the record that my opponent was saying that Mr. Post, the insider, has been paid. That's just not true. It's not called for in the plan and that didn't happen. Mr. Post's claim is specifically subordinated to all unsecured creditors and he has not been paid. On the other hand, 17 creditors other than Mr. Post have been paid and none of those parties are here today before this court. So when the district court looked at those factors and compared them and decided where should the equities lie and could an effective remedy be fashioned, short of knocking out the props from under the plan and starting over again, it concluded correctly that nothing could be done other than. Why couldn't you reclassify the status of Mr. Little's secured judgment and Mr. Post's unsecured note or whatever it was he got back from and just flip it around? That's an excellent question, Your Honor, and here's why that can't happen because that would be a collateral attack on a prior order of the bankruptcy court. What happened as part of the confirmation process. So what happened here was using the equitable mootness doctrine, the district court dismissed the appeal. Correct. Okay, so now if, and I don't know what's going to happen here, but if we were to say, no, it's not equitably moot, then it would go back to the district court and the district court would look at the appeal. Correct. And if they prevailed on the appeal, it could go back for a redo of the plan of reorganization. Right. And in that redo of the reorganization plan, I don't know why they couldn't, one of the potential remedies is to shift around how you treat Mr. Post as a creditor and how you treat Mr. Little as a creditor. Let me explain why that would be a collateral attack because it's a different order. We filed, Amber filed a motion to value personal property and to determine the amount of the secured claims. That motion, which came on for hearing at the same time as the confirmation hearing, was unopposed by Mr. Little. And as a result, the bankruptcy court considered exactly that. It considered Mr. Post's secured claim and determined that it was a valid claim prior to the judgment lien of Mr. Little. Not only did they not oppose that motion, but they didn't take an appeal from that motion. So as a result, what they're asking you to do today... All they're asking me to do, all they're asking this court to do is to take another look at this equitable mootness ruling by the district court. Sure, but what they're in essence saying is let's go back and look at that motion to value property that we didn't oppose three years ago and that we didn't take an appeal from. That's not proper. So when that valuation motion, what exactly was valued? All of the debtor's personal property, declaration, evidence, and by the way... And this is Amber Corporation? Yes, sir. And the actual motion is set forth in the record. It's at 370, as is the order approving the valuation. That's at the record at 28. And so the court considered, based upon declaration testimony, what all of the assets of Amber consisted of and looked at the liens that were against those assets. And it's based upon that motion that the bankruptcy court then found. Mr. Post had a partially secured claim and a partially unsecured claim. Mr. Little had a fully unsecured claim. And what the plan did with respect to Mr. Little's unsecured claim is it subordinated to all other creditors with respect to Mr. Little's unsecured claim. That was just part of class... So the recorded judgment was not in any way secured within the meaning of that provision? After. It came later in time. Oh. Yes. That was a misstatement on the part of opposing counsel. The security interest of Mr. Post, which was validated... So Mr. Post, by acting promptly, was basically able to knock out... Yes. That is exactly correct. He had some pretty good legal advice. Well, I didn't represent Mr. Post. I've only represented Amber. That's exactly what happened. Is Post still in business under Amber? Amber Hotel is still in business today, Your Honor, yes. What? Yes, it is still in business today. It's a company that deals exclusively with selling hotels. So it's basically a personal services business company. But the point is, to go back to your... Is he selling any of Trump's hotels? I don't believe so, Your Honor. But they would certainly take the listing if it was presented to it. Your Honor, you asked a question before, which is, could we rewrite the plan? And the statement was, yes, you could rewrite the plan to pay out more money to the creditors. Well, again, that attacks one of the fundamental props that this plan was based upon, which was the analysis of the debtor's financial condition. Evidence was presented at the confirmation hearing, which was not opposed by the appellant. And we explained, based upon debtor's financial condition, historical and projected, as well as the unopposed motion to determine the amount of the property, that's how much the debtor should have to pay out. Those components of the plan were not opposed. Let me ask you this. Another consideration that I think I read in the briefs was that the bankruptcy court, on a redo, assuming they were to go back for that, assuming they would prevail on their appeal, why couldn't the bankruptcy court require Mr. Post or require an additional contribution to the estate? So it went from $50,000 to $100,000, if I'm not mistaken. It was $104,000. $104,000. $104,000. And that was based upon an unopposed appraisal that was presented to the bankruptcy court that valued the enterprise value of Amber Hotel Corporation. Mr. Little then agreed to contribute that $104,000 and, again, that valuation was not opposed by Mr. Little at the time of the confirmation hearing. So it's nice that now, three years later, he wants to come back and say, well, shouldn't we try to force the debtor to spend more money? But the point is, he had an opportunity to do that and didn't take advantage of it, nor did he present any evidence to suggest that what Amber was paying and what Mr. Post was contributing was not fair, reasonable, or equitable. It was exactly what the declaration evidence presented to the court required, and that's what was paid. But the other point that I wanted to come back to, Your Honor, that I heard was that this is really just a two-party dispute and there's very few parties here. That's not true. There are over 17... How much money has been paid out to date? Almost $300,000, Your Honor. It was about $70-something thousand to the admin and priority creditors and another $204,000, $208,000 to the unsecured creditors. And at this point, the plan is fully consummated. We've made all of the plan payments. There's nothing left to pay. And Mr. Little gets nothing? No. Well, the Franchise Tax Board got paid on behalf of Mr. Little because they have a priority lien on his claim. On his claim. Yes, but they've been paid. Which gets to the next point, which is... What when you say they've been paid? To whom are you referring? The Franchise Tax Board. Oh, the Franchise Tax Board. Little owed money to the Franchise Tax Board? Is that what happened? Yes, that's exactly right. And they asserted a lien on his judgment. And so under the plan, instead of paying Little, the Franchise Tax Board was paid. How much was that? I believe it's $168,000 approximately. They're by far the largest unsecured creditor. One other quick point. There's a reference that the opposing counsel made to these so-called non-noticed creditors. And there's two points that I'd like to make about that. One, they showed up on the day of the confirmation hearing, and we explained to the bankruptcy court that these may be creditors of Mr. Little, but they are certainly not creditors of Amber's estate. Here's the two points. One, Mr. Little did not raise that objection at the bankruptcy court. He did not raise that objection at the district court. And those creditors have not appealed. So I believe that that finding should be complete at this point. If they thought they had been wronged, they certainly could have come before this court, and they haven't. Your Honor, Your Honors, simply put, we believe that the district court properly applied the four-part test, and each of those prongs of the test clearly show that this appeal should be equitably moved. No stay was sought, and there's been no explanation as to why a stay was sought. And that's how you try to protect the interest of the third parties. As a result, since no stay was sought, Amber did what a reorganized editor should do. It moved forward and confirmed its plan, fully consummated its plan, and third parties reasonably relied on that confirmation order. At this point, we get to the fourth factor, which is, is it practical and equitable at this point to go back and make Amber start all over again? And the answer should be no. All right. Thank you. Thank you. Thank you for your consideration. All right. See, I think you had a little bit of time for rebuttal. In no particular order here, Your Honor, the Franchise Tax Board was listed as a creditor. They were not paid out as a lien holder against Mr. Little. The Franchise Tax Board was given notice and, in fact, voted on the confirmation plan. The debtor themselves recognized that that lien that they had creates the voting rights and a right to notice. There is absolutely no distinction in the position by the Franchise Tax Board to these other creditors that were not paid. Other creditors of Mr. Little. Other creditors of Mr. Little, but to be clear, the Franchise Tax Board was a creditor of Mr. Little. They were not a creditor of Amber either. That's why I'm saying they stood in the exact same shoes, yet the Franchise Tax Board was paid out in full. The Franchise Tax Board was given an opportunity to vote on the plan and object to the plan. These other creditors were never given any such right. And while we're not here to stand in the shoes of those creditors to raise their claims, it does bring into stark question whether or not the confirmation plan was proffered in good faith or bad faith. And if it was proffered in bad faith, then it is defeated on its face and everything would start over anyhow. I would also mention to the court that when Mr. Oberg indicates that the appraisal was unopposed, that's not entirely accurate. The problem with opposing that appraisal plan is that Mr. Little didn't have, as did the other creditors, didn't have the full facts. They were unable to do it because information was still being sought from the independent examiner. And that independent examination would have provided Mr. Little with the ability to raise the objection. And in fact, on the day of the confirmation plan, they requested a continuance for the purpose of being able to provide that information to the court. Short of doing that, they would have provided an objection without foundation. And that's why no objection to the appraisal value was raised at the time, because to do so, frankly, would not have been good faith on the part of Mr. Little. It is the appraiser's information and that information sought during discovery which, as noted in the brief, Mr. Post himself at best played games with his answers in providing that they waited for. Otherwise, they couldn't properly provide the court with the information that would have been a substantive objection rather than just saying objection because we think there's something there. And that's why the court should – Is he correct that the plan's been fully implemented? I do not believe that that's the case, Your Honor. However, I will defer. If he's saying that his client did so, I would defer to him. I'm not prepared to say otherwise in front of this court. As far as we're concerned, the plan's been fully implemented. Your Honor, the thing, though, is even if it has been fully implemented, there's nothing that could not be undone. He mentioned the 17 other creditors. However, most of those creditors are not actually third parties. They include Post Management. They include Post himself, his wife, et cetera, as well as counsel themselves and the other administrators to the plan. All these people had notice. They're basing it upon the stay and that it's been fully implemented, but they already had notice that this very – Why didn't your client ask for a stay? Not meaning to correct, Your Honor, the correct question there is why didn't his counsel? It assumes that my client did not. There's no question that best practices would have been to request the stay. We don't deny that. We don't refute that. Unfortunately, that best practice wasn't taken by his counsel at the time. However, that is not dispositive of Mr. Little's ability to seek remedy and to have the court remand this and determine whether or not the actual plan itself was profited in good faith or not and whether or not the examiner should have been given an opportunity to finish his work and provide information to all parties, including the third-party creditors who were never noticed. For that reason, Your Honors, Mr. Little respectfully submits that this case should be remanded that the equitable mootness matter should be overturned. Thank you, Your Honors. Thank you, counsel. The matter is submitted.
judges: Pregerson, Noonan, Paez